1

2

3

4

5

6

7

8 IN THE UNITED STATES DISTRICT COURT

9 FOR THE EASTERN DISTRICT OF CALIFORNIA

10 MICHAEL RAY CHAVEZ,

11             Petitioner,                    No. CIV S-09-2048-JAM-TJB

12 vs.

13 JOHN HAVILAND,

14             Respondent.             FINDINGS AND RECOMMENDATIONS

15 _____/

16                               I. INTRODUCTION

17      Petitioner Michael Ray Chavez is a state prisoner proceeding pro se with a petition for

18 writ of habeas corpus pursuant to 28 U.S.C. § 2254. Based on a thorough review of the record

19 and the applicable law, it is recommended that the petition be denied.

20                         II. PROCEDURAL HISTORY

21      Petitioner is currently serving sentences of thirty years to life for second degree murder,

22 an additional four years for the prior prison term enhancements, and ten years, stayed, for

23 evading an officer and causing a death. Lodged Doc. 10, at 7. At the first trial, a Sacramento

24 County jury convicted Petitioner of two counts: (1) second degree murder; and (2) "evading an

25 officer and causing the death of another (Veh. Code § 2800.3)." Lodged Doc. 1, at 9. For second

26 degree murder, Petitioner was sentenced to fifteen years to life, doubled to thirty years to life

1

1   under the three strikes law, plus an additional four years for his prior prison term enhancements.
2   *Id.* at 9-10. For evading an officer, Petitioner was sentenced to the upper term of five years,
3   doubled to ten years under the three strikes law, "which was stayed pursuant to Penal Code
4   section 654." *Id.* at 10. On December 8, 2005, the California Court of Appeal, Third Appellate
5   District, reversed and remanded the second degree murder conviction because the trial court
6   "erred in instructing the jurors that they could find [Petitioner] guilty of second degree murder if
7   they found he caused Cynthia Rowland's death while [Petitioner] was violating section 2800.2"
8   of the California Vehicle Code.[1] *Id.* at 12. The Court of Appeal affirmed the other conviction.
9   *Id.* at 10 (rejecting Petitioner's other claims of error).

10   At retrial, the Sacramento County jury found Petitioner guilty of second degree murder on
11   November 17, 2006. *See id.* at 154, 158. The trial court reimposed Petitioner's earlier sentences
12   of thirty years to life for second degree murder, an additional four years for the prior prison term
13   enhancements, and ten years, stayed, for evading an officer and causing a death. *See* Lodged
14   Doc. 10, at 7. Petitioner appealed his conviction to the California Court of Appeal, Third
15   Appellate District, which issued a reasoned opinion affirming the conviction on April 30, 2008.
16   *See* Lodged Doc. 1, at 166; Lodged Doc. 10. Petitioner sought review in the California Supreme
17   Court, which denied the appeal without a written decision on July 9, 2008. *See* Lodged Docs.
18   11-12.

19   On July 24, 2009, Petitioner filed the instant federal petition for writ of habeas corpus.
20   Respondent filed an answer to the petition on November 13, 2009, to which Petitioner filed a
21   traverse on February 1, 2010.

22
23
24

25   [1] "[T]he second degree felony-murder rule does not apply when a killing occurs during a
26   violation of section 2800.2." Lodged Doc. 1, at 11-12 (quoting *People v. Howard*, 34 Cal. 4th
     1129, 1139, 23 Cal. Rptr. 3d 306, 104 P.3d 107 (2005)) (internal quotation marks omitted).

1

## III. FACTUAL BACKGROUND[2]

2

3

4

5

6

Sacramento County Deputy Sheriff Brian Amos was on duty the early morning hours of May 15, 2002, in a marked control car, accompanied by his canine partner, Jimmy. Amos was in Citrus Heights looking for defendant, a parolee with an outstanding arrest warrant. Amos had a description of defendant: white male, 28 years old, five feet eleven inches tall, 200 pounds, with brown hair and multiple tattoos. Amos also knew that defendant had been driving a white 2002 Chevrolet Impala with no license plates.

7

8

9

At 4:20 a.m., Amos saw a car that matched the description of the Impala. The white car was entering an alleyway behind 6533 Greenback Lane as Amos was exiting the alleyway. The car turned in front of Amos and slowly passed by him, coming within two or three feet.

10

11

12

13

As the car passed, Amos turned on a light on his patrol vehicle's driver's side that illuminated the area outside the driver's door out to approximately 100 feet (an "alley light"). The light illuminated the interior of the white car. Amos saw the car's driver for about two seconds. The driver matched defendant's description. Amos also saw other areas of the car's interior, and he did not see anyone else inside the car. Amos did not recall whether there was another source of lighting in the alleyway that morning.

14

15

16

17

18

19

After the car passed, Amos noticed the car's taillights were consistent with the distinctive shape of an Impala's taillights. He quickly made a u-turn and pulled up behind the car. He did not see anyone but the driver inside. The Impala picked up speed, then slowed as it approached two other marked patrol cars parallel parked on each side of the alleyway. The Impala paused, drove between the patrol cars, then sped off. Amos followed the Impala between the parked patrol cars. The passage was so narrow that his right mirror closed on one of the parked cars. He activated his lights and siren, and he informed dispatch he was in pursuit of the person they had been seeking.

20

21

22

The pursuit went into Placer County, then back into Sacramento County. At times, speeds reached 100 miles per hour. The Impala drove through numerous stop signs and red lights. As he pursued the Impala, Amos asked dispatch to provide him with defendant's last known address, as a suspect in a pursuit frequently goes to an

23

24

25

26

[2] These facts are from the California Court of Appeal's opinion issued on April 30, 2008. *See* Lodged Doc. 10, at 2-7. Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Moses v. Payne,* 555 F.3d 742, 746 n.1 (9th Cir. 2009); *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir. 2004).

3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

area he is familiar with. Defendant's address was near Champion Oaks Drive and Cirby Way. During the pursuit, the Impala drove in a circle and around the general area of Champion Oaks Drive and Cirby Way.

Deputies laid down tack strips at two different locations. The Impala hit the first strip but did not stop. It later hit the second strip, and the Impala still did not stop even though the tire tread came off and the car was being driven on at least one wheel rim. Amos got within four or five car lengths of the Impala, and still he did not see any other person in the car other than the driver.

As the Impala proceeded south on Bell Street, it ran a red light at the intersection of Marconi Avenue and Bell Street. It collided with a Geo Metro proceeding east on Marconi Avenue. The collision killed the driver of the Geo, Cynthia Bernadette Rowland, who was driving to her job that morning. She worked as a school bus driver.

It seemed to Amos that when the cars collided, they disappeared from his sight. He was about 250 feet behind the Impala when the cars hit. As he reached the intersection, he saw both vehicles in different locations. He focused his attention on the Impala, knowing that deputies behind him would attend to the driver of Geo. Other officers set up a perimeter intended to contain the suspect.

When Amos and Jimmy went up to the Impala's driver's door, they found no one inside the car. Amos commanded Jimmy to "find him," and Jimmy began searching using a tunnel scent method. With this method, the dog follows a scent a person leaves in the air as the person runs through an area. Jimmy ran through the front yards of nearby houses to a side gate at 2830 Bell Street. Amos opened the gate and let the dog into the backyard. Jimmy went to the fence on the yard's farthest side, indicating to Amos the suspect had hopped the fence.

At that point, Amos received a call that the suspect was in a patio area on the other side of the fence. He and Jimmy proceeded to the next yard, where another deputy and the homeowner were waiting. Jimmy entered the yard and indicated someone was in a screened-off patio area. Amos twice yelled for the person to come out, warning that he would send in the dog. Receiving no response, Amos opened the patio door and sent Jimmy in. Amos and the other deputy then entered the patio, and they found defendant with Jimmy biting his leg.

Amos testified that, without a doubt, defendant was the same person Amos saw driving the Impala as it pulled into the alleyway off Greenback Lane. Officers found on the Impala's right front passenger floorboard a wallet containing defendant's California

4

1       identification card, his Social Security card, and $870 in cash. A
        rental agreement was also found in the vehicle that indicated the
2       car had been rented to one David Purgason. Authorities detected
        and confirmed the presence of amphetamine and
3       methamphetamine in defendant's blood.

4       David Purgason, testifying for the prosecution, stated he rented a
        white Chevy Impala from Enterprise Rent-A-Car on April 25,
5       2002, because he did not have a car to use. After he had rented the
        car, he fell asleep at a house where he was with defendant and
6       others. When he awoke, the Impala was gone. Purgason asked
        defendant where the car was, and defendant said he had it and
7       would return it to Purgason.

8       Purgason stated he rode in the rented car only on one occasion after
        defendant took it. He had been trying to persuade defendant to
9       return the car. Defendant picked Purgason up in the car so they
        could return it. They stopped at a convenience store to get a drink,
10      and then defendant took off in the car, leaving Purgason behind.

11      The day before the accident, a representative of Enterprise
        Rent-a-Car stopped by Purgason's wife's house to inquire about
12      the car. Purgason called his wife at that time. He spoke with the
        representative and told him the car had been stolen three days
13      before.

14      About one week after defendant took the car, Purgason was
        watching the morning news on television and learned the car had
15      been in an accident. He testified he was not in the car the night
        before, and that he was never in the car when it was being pursued
16      by sheriff's deputies.

17      An investigating officer interviewed Purgason the day after the
        accident. He did not observe any injuries on Purgason. Purgason
18      had no difficulty walking or moving about. Other than the rental
        agreement, which he obtained later, the officer found nothing at the
19      scene of the accident linking Purgason to the vehicle.

20                  IV. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

21          An application for writ of habeas corpus by a person in custody under judgment of a state

22      court can be granted only for violations of the Constitution or laws of the United States. 28

23      U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

24      *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

25      This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

26      the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521

                                                    5

1 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999). Under

2 AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

3 state court proceedings unless the state court's adjudication of the claim:

4            (1) resulted in a decision that was contrary to, or involved an
           unreasonable application of, clearly established Federal law, as
5            determined by the Supreme Court of the United States; or

6            (2) resulted in a decision that was based on an unreasonable
           determination of the facts in light of the evidence presented in the
7            State court proceeding.

8 28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

9 *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

10         In applying AEDPA's standards, the federal court must "identify the state court decision

11 that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

12 Where more than one state court has adjudicated Petitioner's claims, a federal habeas court

13 analyzes the last reasoned decision. *Id.* (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)

14 (finding presumption that later unexplained orders, upholding judgment or rejecting same claim,

15 rests upon same ground as prior order)). Thus, a federal habeas court looks through ambiguous

16 or unexplained state court decisions to the last reasoned decision to determine whether that

17 decision was contrary to or an unreasonable application of clearly established federal law. *Bailey*

18 *v. Rae,* 339 F.3d 1107, 1112-13 (9th Cir. 2003). "The question under AEDPA is not whether a

19 federal court believes the state court's determination was incorrect but whether that

20 determination was unreasonable-a substantially higher threshold." *Schriro v. Landrigan*, 550

21 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

22                                 V. CLAIMS FOR REVIEW

23         The petition for writ of habeas corpus sets forth four grounds for relief. First, Petitioner

24 claims that he was denied his Sixth Amendment right to counsel by trial counsel's deficient

25 performance. Pet'r's Pet. 4, ECF No. 1. Second, Petitioner alleges that the trial court erred in

26 not instructing the jury, *sua sponte*, to determine whether prosecution witness David Purgason

6

was an accomplice. *Id.* Third, Petitioner contends that the cumulative effect of errors outlined in the first and second grounds violated his constitutional due process rights. *Id.* at 6. Fourth, Petitioner asserts that the trial court improperly imposed the upper term limit on the second count for evading an officer and causing the death of another. *Id.* For the following reasons, Petitioner's claims lack merit.

A. Ground One: Ineffective Assistance of Counsel

In his first ground for relief, Petitioner argues that his Sixth Amendment right to counsel was violated by trial counsel's ineffective assistance. Specifically, Petitioner claims his counsel failed to object to evidence from a law enforcement experiment used to observe lighting conditions in the alley where the pursuit began. *Id.* at 7. Petitioner argues that the evidence lacks proper foundation because "many significant factors likely changed during the four years between the homicide and the experiment." *Id.* at 9.

1. Prosecution's Experiment

At retrial, the Deputy District Attorney called Sam Gault, a criminal investigator for the Sacramento County District Attorney's Office, as a witness. Lodged Doc. 4, Rep.'s Tr. vol. 2, 382. Gault testified that on November 9, 2006, he and Toni Spence, another criminal investigator, went to "the rear of 6533 Greenback" at 4:15 a.m. "to make some observations about the lighting conditions," *id.* at 383, and to simulate two vehicles approaching. *Id.* at 387. On the night of the experiment, the sky was "clear," stars were "visible," and the moon was "about three quarters visible." *Id.* at 384; *see* Lodged Doc. 10, at 8. Gault and Spence "counted some 27 fourplexes approximately, 14 one side and 13 on the other side of the alley." Lodged Doc. 4, Rep.'s Tr. vol. 2, 384; *see* Lodged Doc. 10, at 8. "[E]ach of the fourplexes had a wall-mounted light on both the east and west side," and a light mounted on "the side that faces the alley." Lodged Doc. 4, Rep.'s Tr. vol. 2, 384; *see* Lodged Doc. 10, at 8. Most of the units did not have garage doors, and all of the units with garage doors "had the door shut." Lodged Doc. 4, Rep.'s Tr. vol. 2, 384; *see* Lodged Doc. 10, at 8. Rather, most of the units had open carports,

7

"in other words, with no door," and those carports "all had an overnight light" that "were on." Lodged Doc. 4, Rep.'s Tr. vol. 2, 384; *see* Lodged Doc. 10, at 8; *see also* Lodged Doc. 4, Rep.'s Tr. vol. 2, 386 ("Most had no garage door.").

Using a report, Gault and Spence attempted to simulate "the two vehicles approaching" in the same manner that the "sheriff vehicle" and the "white vehicle" had "passed in that alleyway." Lodged Doc. 4, Rep.'s Tr. vol. 2, 387; *see* Lodged Doc. 10, at 9. "Gault's car simulated Amos's car, and Spence drove by Gault's car." Lodged Doc. 10, at 9. When the front grill of Gault's car was about even with the front grill of Spence's car, "with probably a distance of four to five feet" between their two vehicles, Gault looked over at Spence in her car. Lodged Doc. 4, Rep.'s Tr. vol. 2, 387-88; *see* Lodged Doc. 10, at 9. Gault was able to see Spence in her car, discern her features, and "could see the right front passenger seat next to her, which was vacant." Lodged Doc. 4, Rep.'s Tr. vol. 2, 388; *see* Lodged Doc. 10, at 9. Gault was able to observe Spence using only "the surrounding ambient light and peripheral lights to the headlights on [his] car." Lodged Doc. 4, Rep.'s Tr. vol. 2, 389; *see* Lodged Doc. 10, at 9. Since the two vehicles were "side by side," Gault's headlights were not beaming toward Spence's car. Lodged Doc. 4, Rep.'s Tr. vol. 2, 389.

## 2. Defense's Experiment

On November 12, 2006, "defense investigator Lisa Gara and her husband went to the same alleyway" at 8:00 p.m. "to reenact Amos's observation of the white car and see how much illumination there was at that location." Lodged Doc. 10, at 9; *see* Lodged Doc. 4, Rep.'s Tr. vol. 2, 418-19. The sky was "slightly overcast," "no moonlight was showing," and Gara "didn't see any stars." Lodged Doc. 4, Rep.'s Tr. vol. 2, 426; *see* Lodged Doc. 10, at 9. Gara stood in the alleyway as her husband drove past her twice. Lodged Doc. 4, Rep.'s Tr. vol. 2, 420-21; *see* Lodged Doc. 10, at 9. She was able to see "an individual in the car with a shaved head," and that "it was a man." Lodged Doc. 4, Rep.'s Tr. vol. 2, 421; *see* Lodged Doc. 10, at 9. However, she "discovered after he did this" that "he was sticking his tongue" at her, both times he drove past

8

1    her. Lodged Doc. 4, Rep.'s Tr. vol. 2, 421; *see* Lodged Doc. 10, at 9. She "couldn't tell"

2    because the "amount of illumination did not identify his face to that degree." Lodged Doc. 4,

3    Rep.'s Tr. vol. 2, 421; *see* Lodged Doc. 10, at 9.

4                 3. State Court Decision

5        The Sixth Amendment guarantees the effective assistance of counsel. The United States

6    Supreme Court sets forth the test for demonstrating ineffective assistance of counsel in

7    *Strickland v. Washington*, 466 U.S. 668 (1984). An allegation of ineffective assistance of

8    counsel requires that a petitioner establish two elements: (1) counsel's performance was

9    deficient; and (2) the petitioner was prejudiced by the deficiency. *Id.* at 687; *Lowry v. Lewis*, 21

10    F.3d 344, 346 (9th Cir. 1994).

11        First, a petitioner must show that, considering all the circumstances, counsel's

12    performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. To

13    this end, a petitioner must identify the acts or omissions that are alleged not to have been the

14    result of reasonable professional judgment. *Id.* at 690. The federal court must then determine

15    whether in light of all the circumstances, the identified acts or omissions were outside the wide

16    range of professional competent assistance. *Id.* "We strongly presume that counsel's conduct

17    was within the wide range of reasonable assistance, and that he exercised acceptable professional

18    judgment in all significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990)

19    (citing *Strickland*, 466 U.S. at 689).

20        Second, a petitioner must establish that he was prejudiced by counsel's deficient

21    performance. *Strickland,* 466 U.S. at 693-94. Prejudice is found where "there is a reasonable

22    probability that, but for counsel's unprofessional errors, the result of the proceeding would have

23    been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine

24    confidence in the outcome." *Id.*; *see also Williams,* 529 U.S. at 391-92; *Laboa v. Calderon,* 224

25    F.3d 972, 981 (9th Cir. 2000).

26        Here, because the California Supreme Court summarily denied Petitioner's claims, the

1 state court decision appropriate for review is the California Court of Appeal's decision. In
2 applying AEDPA's standards, this Court finds that the Court of Appeal properly held Petitioner
3 "did not suffer ineffective assistance." *See* Lodged Doc. 10, at 8. The Court of Appeal
4 reasonably found that: (1) trial counsel had a "rational tactical purpose" in not objecting to
5 evidence of the experiment; (2) an objection to Gault's testimony "would likely have been
6 overruled;" and (3) "there was no reasonable likelihood exclusion of the testimony would have
7 resulted in a different result" because "[t]he evidence against defendant was overwhelming." *Id.*
8 at 10-11.

9 First, Petitioner failed to show that trial counsel's performance fell below an objective
10 standard of reasonableness because counsel had a "rational purpose for the failure to object," and
11 the failure was not prejudicial. *People v. Lucas*, 12 Cal. 4th 415, 445, 48 Cal. Rptr. 2d 525, 907
12 P.2d 373 (1995). Rather, "the record disclosed a purpose – the desire to admit evidence of
13 [Petitioner's] own experiment" with favorable results to Petitioner. Lodged Doc. 10, at 10. As
14 stated earlier, when defense counsel's investigator performed the experiment, she was unable to
15 discern that her husband, who drove past her twice, had stuck his tongue out at her both times.
16 Lodged Doc. 4, Rep.'s Tr. vol. 2, 421; *see* Lodged Doc. 10, at 9. Thus, the Court of Appeal
17 appropriately found that "[d]efense counsel would not have wanted to object to Gault's testimony
18 knowing his own investigator had conducted a similar experiment with results favorable to his
19 client." Lodged Doc. 10, at 10; *see Hughes*, 898 F.2d at 702 (finding strong presumption that
20 counsel exercised acceptable professional judgment in all significant decisions made); *Lucas*, 12
21 Cal. 4th at 437, 48 Cal. Rptr. 2d 525, 907 P.2d 373 ("'Reviewing courts will reverse convictions
22 [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively
23 discloses that counsel had no rational tactical purpose for [his or her] act or omission.'" (quoting
24 *People v. Zapien*, 4 Cal. 4th 929, 980, 17 Cal. Rptr. 2d 122, 846 P.2d 704 (1993))).

25 As well, Petitioner cannot demonstrate how his counsel's failure to object to this
26 testimony was outside the range of professionally competent assistance because an objection to

10

1   Gault's testimony would likely have been overruled. In *People v. Bradford*, 15 Cal. 4th 1229,

2   1326, 65 Cal. Rptr. 2d 145, 939 P.2d 259 (1997), the California Supreme Court held:

3           It is settled that a trial court has discretion to admit "experimental"
            evidence. The proponent of such evidence bears the burden of
4           production and proof on the question whether such evidence rests
            upon an adequate foundation. "Admission of such evidence
5           depends upon proof of the following foundational items: (1) [t]he
            experiment must be relevant; (2) it must have been conducted
6           under at least substantially similar, although not necessarily
            absolutely identical, conditions as those of the actual occurrence;
7           (3) the qualifications of the individual testifying concerning the
            experimentation must be demonstrated with some particularity; and
8           (4) evidence of the experiment will not consume undue time,
            confuse the issues, or mislead the jury."
9

10   15 Cal. 4th 1229, 1326, 65 Cal. Rptr. 2d 145, 939 P.2d 259 (1997) (quoting *People v. Turner*, 8

11   Cal. 4th 137, 198, 32 Cal. Rptr. 2d 762, 878 P.2d 521 (1994); *People v. Bonin*, 47 Cal. 3d 808,

12   847, 254 Cal. Rptr. 298, 765 P.2d 460 (1989)). "We reverse decisions to admit or exclude such

13   evidence only when the trial court has clearly abused its discretion." *People v. Boyd*, 222 Cal.

14   App. 3d 541, 566, 271 Cal. Rptr. 738 (1990); *see* CAL. EVID. CODE § 352. "The standard that

15   must be met in determining whether the proponent of the experiment has met the burden of proof

16   of establishing the preliminary fact essential to the admissibility of the experimental evidence is

17   whether the conditions were *substantially identical, not absolutely identical*." *People v. Roehler*,

18   167 Cal. App. 3d 353, 385-86, 213 Cal. Rptr. 353 (1985).

19       Here, the Court of Appeal reasoned that even if trial counsel had objected to Gault's

20   testimony, he would have been overruled because "the trial court would have likely determined

21   that Gault's testimony satisfied" the above-stated "foundational requirements." Lodged Doc. 10,

22   at 11. Petitioner contended that "Gault did not establish the lighting conditions during his

23   simulation were similar to conditions on May 22, 2002 [sic]." Pet'r's Pet. 10. The Court of

24   Appeal, however, recognized that "Gault performed his test without the aid of an alley light,"

25   implying that Amos had a better view of Petitioner than Gault had of Spence, and "Gault was

26   still able to see Spence as she drove by." Lodged Doc. 10, at 11. The Court of Appeal found that

11

1   "[t]he differences raised by defendant are not significant" because the experiment "was
2   conducted at night at the identical location and roughly the same time where the actual event
3   occurred." *Id.*; *see, e.g.*, *Bradford*, 15 Cal. 4th at 1327, 65 Cal. Rptr. 2d 145, 939 P.2d 259
4   (finding trial court properly determined foundational considerations were established where, *inter*
5   *alia*, "police photographer stood at the same location as that used by defendant, at approximately
6   the same time of day"); *Roehler*, 167 Cal. App. 3d at 387, 213 Cal. Rptr. 353 (holding trial court
7   did not err in admitting dory tests because "[t]he prosecution was not under a duty to test the dory
8   under the worst possible weather conditions, but merely to meet the requirement that the test be
9   conducted under substantially similar conditions. This they did."); *cf. Boyd*, 222 Cal. App. 3d at
10  566, 271 Cal. Rptr. 738 (determining trial court appropriately excluded film of defendants'
11  attempt to replicate lighting conditions during crime where cinematographer (1) "conceded that
12  the angle of the moon was not the same;" (2) "did not position a truck with its headlights on at
13  the scene or reproduce the reflection of light from the chrome grille of a parked car," and (3)
14  "was also unsure whether the foliage on a tree at the site, and the resulting pattern of shadows,
15  were the same"). An attorney's failure to make a meritless objection or motion does not
16  constitute ineffective assistance of counsel. *Jones v. Smith*, 231 F.3d 1227, 1239 n.8 (9th Cir.
17  2000) (citing *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985)); *see also Rhoades v. Henry*,
18  596 F.3d 1170, 1179 (9th Cir. 2010) (holding counsel did not render ineffective assistance in
19  failing to investigate or raise argument on appeal where "neither would have gone anywhere");
20  *Matylinsky v. Budge*, 577 F.3d 1083, 1094 (9th Cir. 2009) (concluding counsel's failure to object
21  to testimony on hearsay grounds not ineffective where objection would have been properly
22  overruled); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile
23  action can never be deficient performance . . . .").

24          Second, assuming arguendo the failure to object was an error, Petitioner would still be
25  unable to demonstrate prejudice because "[t]he evidence against defendant was overwhelming."
26  Lodged Doc. 10, at 11.  Prior to the chase, Petitioner had possession of the car.  *See* Lodged Doc.

1    3, Rep.'s Tr. vol. 1, 248; *see also* Lodged Doc. 10, at 11. Amos confirmed he "match[ed] the
2    description" that he had been given of Petitioner to the driver of the white car. Lodged Doc. 3,
3    Rep.'s Tr. vol. 1, 98; *see* Lodged Doc. 10, at 11. Amos testified, "I didn't see anyone else in the
4    car" but Petitioner. Lodged Doc. 3, Rep.'s Tr. vol. 1, 98, 134; *see* Lodged Doc. 10, at 12. Jimmy
5    "follow[ed] the airborne scent left behind by . . . the person that was in that vehicle" to "a
6    screened-off patio area." Lodged Doc. 3, Rep.'s Tr. vol. 1, 128, 130; *see* Lodged Doc. 10, at 12.
7    Amos entered the patio area and saw Petitioner "standing up with the dog on his leg." Lodged
8    Doc. 3, Rep.'s Tr. vol. 1, 132; *see* Lodged Doc. 10, at 12. "Defendant's wallet was found in the
9    car, containing his California identification card, his Social Security card, and $870 in cash."
10    Lodged Doc. 10, at 12; *see* Lodged Doc. 3, Rep.'s Tr. vol. 1, 286. Thus, the Court of Appeal
11    properly concluded that "there was no showing of prejudice due to defense counsel's failure to
12    object to Gault's testimony." Lodged Doc. 10, at 12.

13          B. Ground Two: Jury Instruction

14         In his second ground for relief, Petitioner argues that the trial court erred by failing to
15    instruct the jury, *sua sponte*, on accomplice testimony. Specifically, Petitioner contends that the
16    trial court should have instructed the jury "to determine whether prosecution witness David
17    Purgason was an accomplice." Pet'r's Pet. 4. "Had the court given proper instructions,"
18    Petitioner asserts, "the jury would have determined Purgason was an accomplice whose
19    testimony required corroboration and should be viewed with distrust." *Id.* Two defense
20    witnesses, Darryl Foshee and Fawn Butrick, testified to try to rebut Purgason's claim that he was
21    not in the Impala near the time of the pursuit. Lodged Doc. 10, at 12.

22            1. Defense Witness Darryl Foshee

23         The testimony of Foshee, an unavailable witness, was read to the jury. *Id.*; *see* Lodged
24    Doc. 4, Rep.'s Tr. vol. 2, 496-97. In May 2002, Foshee was at the Greenback Lane fourplexes
25    for "[a]bout a week, week and a half," partying and using methamphetamine everyday, when he
26    was arrested. Lodged Doc. 4, Rep.'s Tr. vol. 2, 498-99; *see* Lodged Doc. 10, at 12. Petitioner

1    was with him during that week, "doing dope" too. Lodged Doc. 4, Rep.'s Tr. vol. 2, 499; *see*
2    Lodged Doc. 10, at 12.

3         On the day of Foshee's arrest, Petitioner was at the Greenback Lane fourplex alone with a
4    white, "[b]ald-headed guy" named Dave. Lodged Doc. 4, Rep.'s Tr. vol. 2, 500; *see* Lodged
5    Doc. 10, at 13. Foshee was unable to recall Dave's last name. Lodged Doc. 4, Rep.'s Tr. vol. 2,
6    500. Petitioner and Dave arrived in a new, "white car," delivering methamphetamine. Lodged
7    Doc. 4, Rep.'s Tr. vol. 2, 501; *see* Lodged Doc. 10, at 13. Foshee did not see Petitioner and Dave
8    leave, but testified that Petitioner and Dave left about half an hour after they arrived. Lodged
9    Doc. 4, Rep.'s Tr. vol. 2, 502; *see* Lodged Doc. 10, at 13. After they left, the police arrived and
10   arrested Foshee. Lodged Doc. 4, Rep.'s Tr. vol. 2, 502; *see* Lodged Doc. 10, at 13. Foshee was
11   "put in the back of a cop car . . . [i]n the alley behind the apartment." Lodged Doc. 4, Rep.'s Tr.
12   vol. 2, 502; *see* Lodged Doc. 10, at 13. While Foshee sat in the car, he saw the white car drive
13   between the police car he was in and another police car, scraping both police cars. Lodged Doc.
14   4, Rep.'s Tr. vol. 2, 503, 511; *see* Lodged Doc. 10, at 13. Foshee testified that he was unable to
15   see who was driving the car, or how many people were in the car. Lodged Doc. 4, Rep.'s Tr. vol.
16   2, 503-04; *see* Lodged Doc. 10, at 13.

17        On cross-examination, Foshee testified that he spoke to defense investigators twice.
18   Lodged Doc. 4, Rep.'s Tr. vol. 2, 507; *see* Lodged Doc. 10, at 13. In the first interview, Foshee
19   could not remember if he told the defense investigator that he "thought there were two people in
20   the vehicle," and Foshee denied saying that in the second interview. Lodged Doc. 4, Rep.'s Tr.
21   vol. 2, 511-12; *see* Lodged Doc. 10, at 13. Foshee confirmed that "it wasn't until the second
22   interview," when Foshee looked at a single photograph provided by another defense investigator
23   and he "saw that Dave was bald . . . and had a goatee," that he was "able to describe this person
24   named Dave." Lodged Doc. 4, Rep.'s Tr. vol. 2, 508-09; *see* Lodged Doc. 10, at 13. Foshee had
25   four felony convictions for: (1) "unlawful sex with a minor;" (2) "grand theft;" (3) "taking of a
26   vehicle;" and (4) "felon in possession of a firearm." Lodged Doc. 4, Rep.'s Tr. vol. 2, 512-13,

14

1   517; *see* Lodged Doc. 10, at 13.

2        Charles Magnuson, a "[c]riminal investigator with the Sacramento County public
3   defender's office," testified that he interviewed Foshee on March 5, 2003. Lodged Doc. 4,
4   Rep.'s Tr. vol. 2, 542, 547; *see* Lodged Doc. 10, at 13. Foshee told him that "[Petitioner] and
5   another guy arrived at the house he was at . . . in a white car. And they left in the white car."
6   Lodged Doc. 4, Rep.'s Tr. vol. 2, 544; *see* Lodged Doc. 10, at 13. When Foshee was in the
7   "back seat . . . of a police car," he said, "I could see that there was two people in the car. But I
8   could not see who was driving." Lodged Doc. 4, Rep.'s Tr. vol. 2, 545; *see* Lodged Doc. 10, at
9   13.

10       "Defense investigator Flossie Crump testified that she interviewed Foshee on March 12,
11  2003," at 10:30 a.m. Lodged Doc. 10, at 14; *see* Lodged Doc. 4, Rep.'s Tr. vol. 2, 524. Foshee
12  indicated to her that "he saw two people in the vehicle. But he couldn't tell who was driving."
13  Lodged Doc. 4, Rep.'s Tr. vol. 2, 525; *see* Lodged Doc. 10, at 14. Crump showed Foshee a
14  California driver's license of David Wayne Purgason, and Foshee responded that the photograph
15  "looked like the guy who was with [Petitioner] earlier when he had seen him at the apartment."
16  Lodged Doc. 4, Rep.'s Tr. vol. 2, 525-26; *see* Lodged Doc. 10, at 14.

17       On October 24, 2006, defense investigator Lisa Gara also interviewed Foshee. Lodged
18  Doc. 4, Rep.'s Tr. Tr. vol. 2, 553; *see* Lodged Doc. 10, at 14. "It was [Gara's] impression that
19  [Foshee] saw two people in the car," but "[h]e didn't know who was in the car." Lodged Doc. 4,
20  Rep.'s Tr. vol. 2, 554-55; *see* Lodged Doc. 10, at 14. The parties stipulated that Gara's notes
21  included a statement by Foshee "in reference to . . . [Petitioner] and the person he came to the
22  apartment with . . . ." Lodged Doc. 5, Rep.'s Tr. vol. 3, at 605; *see* Lodged Doc. 10, at 14.
23  Foshee stated, "[T]hey didn't stay long. [Petitioner] said I'm going to come back. And I'm
24  dropping off my homeboy." Lodged Doc. 5, Rep.'s Tr. vol. 3, at 605; *see* Lodged Doc. 10, at 14.

25       David Duckett, an investigator for the Sacramento County District Attorney's Office, also
26  interviewed Foshee in March 2003. Lodged Doc. 4, Rep.'s Tr. vol. 2, 590; *see* Lodged Doc. 10,

1 │ at 14.  The Court of Appeal recounted:

2 │　　　　　The interview was recorded, and the recording was played for the
　│　　　　jury.  During the interview, Foshee stated that his statement to
3 │　　　　defense investigators was that defendant left the fourplex with
　│　　　　another man, and Foshee did not see who was in the car when it
4 │　　　　came back.  He was sitting in the police car when, suddenly, the
　│　　　　white car hit the police cars and then went right through them.
5 │　　　　Foshee believed it was about 45 minutes from the time defendant
　│　　　　and Dave left the fourplex until Foshee saw the white car pass the
6 │　　　　patrol cars.

7 │　　　　　Responding to a question while testifying, Duckett agreed that the
　│　　　　only time Foshee was referring to defendant being with another
8 │　　　　person was when defendant and Dave came into the fourplex, not
　│　　　　later when the white car drove by the patrol car in which Foshee
9 │　　　　was sitting.

10 │ Lodged Doc. 10, at 14-15; *see* Lodged Doc. 4, Rep.'s Tr. vol. 2, 602.

11 │　　　　　　　　　2.  Defense Witness Fawn Butrick

12 │　　　　Fawn Butrick, Petitioner's "friend[] for a number of years," was the second defense

13 │ witness used in an attempt to impeach Purgason.  Lodged Doc. 4, Rep.'s Tr. vol. 2, 451; *see*

14 │ Lodged Doc. 10, at 15.  Butrick had ridden in the white Impala "at least three times."  Lodged

15 │ Doc. 4, Rep.'s Tr. vol. 2, 452; *see* Lodged Doc. 10, at 15.  During those times, a "[m]an known

16 │ as Junior . . . , Dave [Purgason] of course, and [Petitioner]" had operated the car.  Lodged Doc. 4,

17 │ Rep.'s Tr. vol. 2, 452; *see* Lodged Doc. 10, at 15.  In the afternoon or evening, on May 12 or 13,

18 │ Petitioner and Purgason went to her apartment and picked her up.  Lodged Doc. 4, Rep.'s Tr. vol.

19 │ 2, 453-54; *see* Lodged Doc. 10, at 15.  They "took a ride out to . . . Citrus Heights."  Lodged Doc.

20 │ 4, Rep.'s Tr. vol. 2, 454; *see* Lodged Doc. 10, at 15.  Purgason and Butrick dropped off

21 │ Petitioner, and then picked him up later.  Lodged Doc. 4, Rep.'s Tr. vol. 2, 454; *see* Lodged Doc.

22 │ 10, at 15.

23 │　　　　Butrick admitted that she, Petitioner, and Purgason used methamphetamine from the end

24 │ of April through all of May of 2002.  Lodged Doc. 4, Rep.'s Tr. vol. 2, 461-62; *see* Lodged Doc.

25 │ 10, at 15.  Butrick affirmed that "occasionally, but not always, [Petitioner] was [her] supplier of

26 │ methamphetamine," and she visited Petitioner on a "few occasions" after he was arrested.

1  Lodged Doc. 4, Rep.'s Tr. vol. 2, 462-63; *see* Lodged Doc. 10, at 15. In August 2005, Butrick
2  also had a felony conviction for possession of stolen property. Lodged Doc. 4, Rep.'s Tr. vol. 2,
3  455; *see* Lodged Doc. 10, at 15.

4                  3. State Court Decision

5          Under California Penal Code Section 1111, an accomplice is "one who is liable to
6  prosecution for the identical offense charged against the defendant on trial in the cause in which
7  the testimony of the accomplice is given." To be chargeable with an identical offense, a witness
8  must be considered a principal under section 31. *People v. Horton*, 11 Cal. 4th 1068, 1113, 47
9  Cal. Rptr. 2d 516, 906 P.2d 478 (1995); *but see id.* at 1114, 47 Cal. Rptr. 2d 516, 906 P.2d 478
10  (finding mere accessory is not accomplice). An accomplice must have "'guilty knowledge and
11  intent with regard to the commission of the crime.'" *People v. Lewis*, 26 Cal. 4th 334, 369, 110
12  Cal. Rptr. 2d 272, 28 P.3d 34 (2001) (quoting *People v. Hoover*, 12 Cal. 3d 875, 879, 117 Cal.
13  Rptr. 672, 528 P.2d 760 (1974)).

14          "If there is evidence from which the jury could find that a witness is an accomplice to the
15  crime charged, the court must instruct the jury on accomplice testimony." *Id.* (citation and
16  internal quotation marks omitted). "But if the evidence is insufficient as a matter of law to
17  support a finding that a witness is an accomplice, the trial court may make that determination
18  and, in that situation, need not instruct the jury on accomplice testimony." *Id.* (citing *Horton*, 11
19  Cal. 4th at 1114, 47 Cal. Rptr. 2d 516, 906 P.2d 478; *Hoover*, 12 Cal. 3d at 880, 117 Cal. Rptr.
20  672, 528 P.2d 760 ("Whether the facts with respect to the participation of a witness in the crime
21  for which the accused is on trial are clear and not disputed, it is for the court to determine
22  whether he is an accomplice." (citation and internal quotation marks omitted))). For a witness to
23  be deemed an accomplice, the record must establish "a relationship between the defendant and
24  accomplice, either by virtue of a conspiracy or by acts aiding and abetting the crime." *People v.*
25  *Ward*, 36 Cal. 4th 186, 212, 30 Cal. Rptr. 3d 464, 114 P.3d 717 (2005) (citing *People v.*
26  *Garceau*, 6 Cal. 4th 140, 183, 24 Cal. Rptr. 2d 664, 862 P.2d 664 (1993)). Evidence supporting

1   the request for accomplice instructions must be substantial and not speculative. *Lewis*, 26 Cal.
2   4th at 369, 110 Cal. Rptr. 2d 272, 28 P.3d 34. Substantial evidence is "evidence sufficient to
3   'deserve consideration by the jury,' not 'whenever any evidence is presented, no matter how
4   weak.'" *Id.* (quoting *People v. Williams*, 4 Cal. 4th 354, 361, 14 Cal. Rptr. 2d 441, 841 P.2d 961
5   (1992)).

6          Here, the Court of Appeal properly held Petitioner did not produce substantial evidence
7   that Purgason was an accomplice to the crime. Lodged Doc. 10, at 16. First, the Court of Appeal
8   pointed out that even if Purgason arrived at the fourplex with Petitioner and left with him, and
9   even if Foshee saw two people in the white car as it passed the patrol car, a point on which
10  Foshee was inconsistent, no substantial evidence exists showing Purgason was in the car during
11  the pursuit. *Id.* at 17. As stated earlier, Foshee contradicted himself as to whether he saw two
12  people in the white Impala when it scraped the patrol cars. *Compare* Lodged Doc. 4, Rep.'s Tr.
13  vol. 2, 545 ("I could see that there was two people in the car. But I could not see who was
14  driving."), *with id.* at 503-04 (showing Foshee testified he could not see who was driving car or
15  how many people were in car), *id.* at 602 (revealing Duckett agreed only time Foshee referred to
16  Petitioner being with another person was when Petitioner and Dave came into fourplex, not later
17  when white car drove by patrol car), *and* Lodged Doc. 10, at 15 ("Foshee did not see who was in
18  the car when it came back" to the fourplex.). Foshee failed to identify who might have been in
19  the white car when it passed him. *See* Lodged Doc. 10, at 17. No evidence linked Purgason to
20  the car at the time of the accident, except for the rental agreement, which the investigating officer
21  obtained later. *Id.* at 7, 17; *see* Lodged Doc. 4, Rep.'s Tr. vol. 2, 302 ("There was a rental
22  agreement found in the vehicle which I did not find. It was given to me later.").

23         Second, the Court of Appeal properly found that even if "Purgason sat in the car when it
24  passed Foshee," this does not show that Purgason was an accomplice. Lodged Doc. 10, at 17. It
25  is well established that "[m]ere presence at the scene of a crime which does not itself assist the
26  commission of the crime does not amount to aiding and abetting." *People v. Perez*, 35 Cal. 4th

1    1219, 1224, 29 Cal. Rptr. 3d 423, 113 P.3d 100 (2005) (citing CALJIC No. 3.01); *People v.*
2    *Stankewitz*, 51 Cal. 3d 72, 91, 270 Cal. Rptr. 817, 793 P.2d 23 (1990) (finding presence at scene
3    of crime or failure to prevent commission of crime insufficient to establish aiding and abetting);
4    *see People v. Richardson*, 43 Cal. 4th 959, 1024, 77 Cal. Rptr. 3d 163, 183 P.3d 1146 (2008).
5    Nothing in the record reveals that Purgason directly committed the offense, aided or abetted
6    Petitioner, or advised and encouraged Petitioner.

7          In any event, even assuming error, "[a] trial court's failure to instruct on accomplice
8    liability under section 1111 is harmless if there is sufficient corroborating evidence in the
9    record." *Richardson*, 43 Cal. 4th at 1024, 77 Cal. Rptr. 3d 163, 183 P.3d 1146 (internal
10   quotation marks omitted). "To corroborate the testimony of an accomplice, the prosecution must
11   present 'independent evidence,' that is, evidence that 'tends to connect the defendant with the
12   crime charged' without aid or assistance from the accomplice's testimony." *People v. Avila*, 38
13   Cal. 4th 491, 562-63, 43 Cal. Rptr. 3d 1, 133 P.3d 1076 (2006) (quoting *People v. Perry*, 7 Cal.
14   3d 756, 772, 103 Cal. Rptr. 161, 499 P.2d 129 (1972)). "Corroborating evidence 'must tend to
15   implicate the defendant and therefore must relate to some act or fact which is an element of the
16   crime but it is not necessary that the corroborative evidence be sufficient in itself to establish
17   every element of the offense charged.'" *People v. Sully*, 53 Cal. 3d 1195, 1228, 283 Cal. Rptr.
18   144, 812 P.2d 163 (1991) (quoting *People v. Bunyard*, 45 Cal.3d 1189, 1206, 249 Cal. Rptr. 71,
19   756 P.2d 795 (1988)). "Corroborating evidence may be slight, may be entirely circumstantial,"
20   *People v. Brown*, 31 Cal. 4th 518, 556, 3 Cal. Rptr. 3d 145, 73 P.3d 1137 (2003) (citation and
21   internal quotation marks omitted), and "entitled to little consideration when standing alone."
22   *Avila*, 38 Cal. 4th at 563, 43 Cal. Rptr. 3d 1, 133 P.3d 1076 (citation and internal quotation
23   marks omitted).[3]

24

25          [3] There is no federal constitutional requirement that accomplice testimony be
26   corroborated. *See United States v. Augenblick*, 393 U.S. 348, 352 (1969) ("When we look at the
     requirements of procedural due process, the use of accomplice testimony is not catalogues with

1          Here, the Court of Appeal appropriately found that even if the trial court erred by failing
2 to instruct the jury on accomplice liability, it was harmless, and nothing in the record indicates
3 that Purgason's testimony was incredible or insubstantial. *See* Lodged Doc. 10, at 17. In Gara's
4 notes, Foshee's statement revealed that Petitioner said he was "dropping off [his] homeboy"
5 before coming back to the fourplex. Lodged Doc. 5, Rep.'s Tr. vol. 3, at 605. Purgason testified
6 that he "was never in the car when it was being pursued by sheriff's deputies." Lodged Doc. 10,
7 at 6; *see* Lodged Doc. 3, Rep.'s Tr. vol. 1, 253. Amos's testimony corroborated this, as Amos
8 testified he "saw only one person in the car from the time the car passed him until the accident,
9 and that person was [Petitioner]." Lodged Doc. 10, at 17; *see* Lodged Doc. 3, Rep.'s Tr. vol. 1,
10 98, 134. The experiment by the Deputy District Attorney's investigators verified that one could
11 see into a car at the alley to determine whether a passenger was in the car without an alley light.
12 Lodged Doc. 4, Rep.'s Tr. vol. 2, 388; *see* Lodged Doc. 10, at 17. Notwithstanding, Amos
13 "illuminated" the white car "with [his] alley light . . . [t]o get a better view of the driver," Lodged
14 Doc. 3, Rep.'s Tr. vol. 1, 98, which made "his testimony even stronger" to the Court of Appeal.
15 Lodged Doc. 10, at 17. Further, Jimmy followed the scent in the car only to Petitioner. Lodged
16 Doc. 3, Rep.'s Tr. vol. 1, 128, 130, 132. Also, only Petitioner's wallet was found in the car, with
17 his California identification card and his Social Security card. *Id.* at 286. Thus, even if the trial
18 court should have instructed the jury on accomplice liability, it was harmless error because of the
19 corroborating evidence, and Purgason's testimony was not incredible or insubstantial.

20      C. Ground Three: Cumulative Error

21         In his third ground for relief, Petitioner argues that the cumulative effect of errors in the

22

23 constitutional restrictions."); *Darden v. United States*, 405 F.2d 1054, 1056 (9th Cir. 1969) ("[A] conviction in federal court may be based on the uncorroborated testimony of an accomplice.").
Under current Ninth Circuit authority, accomplice testimony, alone, is sufficient to "sustain a
24 conviction unless it is incredible or insubstantial on its face," or the alleged violation resulted in a fundamental due process violation. *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir.
25 1993); *United States v. Lopez*, 803 F.2d 969, 973 (9th Cir. 1986); *see Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000). "[T]he credibility of witnesses is a question for the jury,
26 unreviewable on appeal." *United States v. Delgado*, 357 F.3d 1061, 1068 (9th Cir. 2004).

1    first and second grounds violated his constitutional due process rights. Pet'r's Pet. 6.

2    "Cumulative error occurs when although no single trial error examined in isolation is

3    sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still

4    prejudice[d] a defendant." *Wooten v. Kirkland*, 540 F.3d 1019, 1022 n.1 (9th Cir. 2008) (quoting

5    *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000)) (internal quotation marks

6    omitted). A court "must ask whether the aggregated errors so infected the trial with unfairness as

7    to make the resulting conviction a denial of due process." *Jackson v. Brown*, 513 F.3d 1057,

8    1085 (9th Cir. 2008) (quoting *Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004)) (internal

9    quotation marks omitted). "[W]here there is no single constitutional error existing, nothing can

10   accumulate to the level of a constitutional violation." *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir.

11   1999), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000).

12   Here, the Court of Appeal properly held that "[h]aving found no individual errors, we

13   cannot conclude there was cumulative error." Lodged Doc. 10, at 18. Because no single

14   constitutional error exists, no errors can accumulate to the level of a constitutional violation.

15   Thus, Petitioner is not entitled to relief on this claim.

16   D. Ground Four: *Cunningham* Claim

17   In his fourth ground for relief, Petitioner contends that the trial court's imposition of the

18   upper term on the second count violated the holdings in *Cunningham v. California*, 549 U.S. 270

19   (2007), *Blakely v. Washington*, 542 U.S. 296 (2004), and *Apprendi v. New Jersey*, 530 U.S. 466

20   (2000). Specifically, when the first trial court imposed the upper prison term on the section

21   2800.3 violation, it relied on two aggravating factors:

22            As to Count Two, the defendant is committed to State Prison for
              the upper term of five years doubled to ten years, pursuant to . . .
23            Penal Code Sections 667(e)(1) and 1170.12(c)(1).

24            The upper term was selected because the defendant's criminal
              record is significant, Rule 421(b)(2) [now Rule 4.421(b)(2), Cal.
25            Rules of Court], and the defendant was on parole when the current
              offense was committed, Rule 421(b)(4) [now Rule 4.421(b)(4),
26            Cal. Rules of Court].

21

1  Pet'r's Pet. 22; *see* Lodged Doc. 10, at 18.  Petitioner argues that "[t]he upper term is

2  unconstitutional because the trial court made factual findings that should have been made by a

3  jury to permit imposition of the upper term."  Pet'r's Pet. 22.

4  1. Legal Standard for Imposition of Upper Term Sentence

5  In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the United States Supreme Court held as

6  a matter of constitutional law that, other than the fact of a prior conviction, "any fact that

7  increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to

8  a jury, and proved beyond a reasonable doubt."  530 U.S. 466, 490 (2000).  In *Blakely v.*

9  *Washington*, 542 U.S. 296 (2004), the Supreme Court held that the "statutory maximum for

10  *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts

11  reflected in the jury verdict or admitted by the defendant."  542 U.S. 296, 303 (2004).  There is a

12  narrow exception to this rule, however, for enhancements based on prior convictions; these need

13  not be submitted to the jury.  *See Almendarez-Torres v. United States*, 523 U.S. 224, 244 (1998)

14  ("[T]o hold that the Constitution requires that recidivism be deemed an 'element' of petitioner's

15  offense would mark an abrupt departure from a longstanding tradition of treating recidivism as

16  'go[ing] to punishment only.'"); *Butler v. Curry*, 528 F.3d 624, 641 (9th Cir. 2008).  In *United*

17  *States v. Booker*, 543 U.S. 220 (2005), the Supreme Court applied its holding in *Blakely* to the

18  Federal Sentencing Guidelines, and held that district courts are not "bound to apply the

19  Guidelines," but "must consult those Guidelines and take them into account when sentencing."

20  543 U.S. 220, 264 (2005).  "[W]hen a trial judge exercises his discretion to select a specific

21  sentence within a defined range, the defendant has no right to a jury determination of the facts

22  that the judge deems relevant."  *Id.* at 233.

23  In *People v. Black*, 35 Cal. 4th 1238, 29 Cal. Rptr. 3d 740, 113 P.3d 534 (2005) ("*Black*

24  *I*"), the California Supreme Court held that California's statutory scheme providing for the

25  imposition of an upper term sentence did not violate the constitutional principles set forth in

26  *Apprendi*, *Blakely*, and *Booker*.  35 Cal. 4th 1238, 1254, 29 Cal. Rptr. 3d 740, 113 P.3d 534

1 (2005). The California Supreme Court reasoned that the discretion afforded to a sentencing
2 judge in choosing a lower, middle, or upper term rendered the upper term under California law
3 the "statutory maximum." *Id.* "[I]n operation and effect, the provisions of the California
4 determinate sentence law simply authorize a sentencing court to engage in the type of factfinding
5 that traditionally has been incident to the judge's selection of an appropriate sentence within a
6 statutorily prescribed sentencing range." *Id.*

7 Most recently, in *Cunningham v. California*, 549 U.S. 270 (2007), the Supreme Court
8 overruled the holding in *Black I*, and held that the middle term in California's determinate
9 sentencing law was the relevant statutory maximum for the purpose of applying *Blakely* and
10 *Apprendi*. 549 U.S. 270, 288 (2007). The Supreme Court held that imposing the upper sentence
11 violated the defendant's Sixth and Fourteenth Amendment right to a jury trial because it "assigns
12 to the trial judge, not the jury, authority to find facts that expose a defendant to an elevated
13 'upper term' sentence."[4] *Id.* at 274.

14 In light of *Cunningham*, the Supreme Court vacated *Black I* and remanded the case to the
15 California Supreme Court for further consideration. *Black v. California*, 549 U.S. 1190, 1199
16 (2007). On remand, the California Supreme Court held that "so long as a defendant is *eligible*
17 for the upper term by virtue of facts that have been established consistently with Sixth
18 Amendment principles, the federal Constitution permits the trial court to rely upon any number
19 of aggravating circumstances in exercising its discretion to select the appropriate term by
20 balancing aggravating and mitigating circumstances, regardless of whether the facts underlying
21 those circumstances have been found to be true by a jury." *People v. Black*, 41 Cal. 4th 799, 813,
22 62 Cal. Rptr. 3d 569, 161 P.3d 1130 (2007) ("*Black II*"). In other words, as long as one

23

24     [4] The Ninth Circuit subsequently held that *Cunningham* may be applied retroactively on
collateral review. *Butler v. Curry*, 528 F.3d 624, 639 (9th Cir. 2008). The effect of *Cunningham*
25 is much dissipated in that the California legislature, subsequent to *Cunningham*, provided that the
upper term was the statutory maximum. *See People v. Sandoval*, 41 Cal. 4th 825, 843-45, 62
26 Cal. Rptr. 3d 588, 161 P.3d 1146 (2007).

23

1 aggravating circumstance is established in a constitutional manner, a defendant's upper term
2 sentence withstands Sixth Amendment challenge. *Id.* Thereafter, relying on *Black II*, the Ninth
3 Circuit confirmed that, under California law, only one aggravating factor is necessary to
4 authorize an upper term sentence. *Butler*, 528 F.3d at 641-43.

5           2. State Court Decision

6         Here, the Court of Appeal properly determined that the trial court committed no error
7 because Petitioner's "criminal record is significant." Lodged Doc. 10, at 18. Rule 4.421(b)(2) of
8 the California Rules of Court provides that numerous convictions may justify an upper term:
9 "[t]he defendant's prior convictions as an adult or sustained petitions in juvenile delinquency
10 proceedings are numerous or of increasing seriousness." "[A]s long as a single aggravating
11 circumstance that renders a defendant *eligible* for the upper term sentence has been established in
12 accordance with the requirements of *Apprendi* and its progeny, any additional factfinding
13 engaged in by the trial court in selecting the appropriate sentence among the three available
14 options does not violate the defendant's right to jury trial." *Black II*, 41 Cal. 4th at 812, 62 Cal.
15 Rptr. 3d 569, 161 P.3d 1130. Accordingly, the Court of Appeal appropriately recognized that
16 Petitioner's "[p]rior convictions are excepted from the jury submission requirement," and the
17 trial court acted properly. Lodged Doc. 10, at 18-19.

18         Even if the trial court violated Petitioner's Sixth Amendment rights, any error was
19 harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Butler*, 528 F.3d at 648-49
20 (conducting harmless error review of *Apprendi* violation). Applying *Brecht*, a habeas court must
21 determine whether "the error had a substantial and injurious effect on [Petitioner's] sentence."
22 *Id.* at 648 (quoting *Hoffman v. Arave*, 236 F.3d 523, 540 (9th Cir. 2001)) (internal quotation
23 marks omitted). "Under that standard, we must grant relief if we are in 'grave doubt' as to
24 whether a jury would have found the relevant aggravating factors beyond a reasonable doubt."
25 *Id.* (citing *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

26         Here, it was undisputed that Petitioner had numerous prior convictions and was on parole

1  at the time of the crime. Accordingly, ample evidence existed for the jury to render a verdict
2  beyond a reasonable doubt on at least one aggravating circumstance. *See also United States v.*
3  *Salazar-Lopez*, 506 F.3d 748, 755 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 2523 (2008) (holding
4  trial court's imposition of enhanced term harmless because trial court relied on fact supported by
5  evidence which was "overwhelming and uncontroverted" (internal quotation marks omitted));
6  *United States v. Zepeda-Martinez*, 470 F.3d 909, 913 (9th Cir. 2006) (same). Thus, the Court of
7  Appeal properly chose not to "disturb the upper term sentence on the Vehicle Code count."
8  Lodged Doc. 10, at 19.

9                                    VI. CONCLUSION

10        For the foregoing reasons, IT IS HEREBY RECOMMENDED that Petitioner's
11  application for writ of habeas corpus be DENIED.

12        These findings and recommendations are submitted to the United States District Judge
13  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one
14  days after being served with these findings and recommendations, any party may file written
15  objections with the court and serve a copy on all parties. Such a document should be captioned
16  "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections
17  shall be served and filed within seven days after service of the objections. Failure to file
18  objections within the specified time may waive the right to appeal the District Court's order.
19  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57
20  (9th Cir. 1991). In any objections he elects to file, Petitioner may address whether a certificate of
21  appealability should be issued in the event he elects to file an appeal from the judgment in this
22  //
23  //
24  //
25  //
26  //

                                        25

1   case. *See* Rule 11(a), Federal Rules Governing Section 2254 Cases (district court must issue or

2   deny certificate of appealability when it enters final order adverse to applicant).

3   DATED:     September ⊃ 2010.

                             TIMOTHY J. BOMMER
                             UNITED STATES MAGISTRATE JUDGE